Troy P. Foster
Megan N. Weides
**The Foster Group, PLLC**
902 W. McDowell Road
Phoenix, Arizona 85007
Tel: 602-461-7990
tfoster@thefosterlaw.com
mweides@thefosterlaw.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**IN THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Carolyn Schutzius, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>Cambridge Companies, Inc., an Arizona corporation;<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

For her Complaint against Cambridge Companies, Inc. ("the Company"), Ms. Carolyn Schutzius ("Plaintiff") alleges as follows:

### Introduction

Defendant terminated Ms. Schutzius only after she requested an accommodation and other employees complained about her presence in the office while being immuno-compromised. In fact, after refusing to engage in the interactive process and denying her accommodation request, the Defendant told Ms. Schutzius that she was being terminated under the guises of an economic downturn from the impact of COVID. Notably, Ms. Schutzius was terminated well before any alleged impact from COVID could be realized, and only she and another disabled employee were terminated permanently.

These are precisely the circumstances the ADA was contemplated to assist and protect employees like Ms. Schutzius. Giving her the ability to work from home, keeping

her job available, not terminating her health insurance and other benefits – so that Ms. Schutzius could focus on staying alive and treating her disabilities.  Instead, Defendant ignored these laws, and deprived Ms. Schutzius of these statutory protections.

## Background Allegations and Jurisdiction

1. At all times relevant to this Complaint, Ms. Schutzius resided in Illinois and is a citizen of the State of Illinois.

2. At all times relevant to this Complaint, Ms. Schutzius worked for the Company in Griffith, Indiana.

3. At all times relevant to this Complaint, the Company was a corporation in Arizona, and was authorized to conduct, and was conducting, business in the State of Arizona.

4. The Company hired Ms. Schutzius as a Marketing Manager on or about July 27 2014.

5. At the time of her termination on or about March 20, 2020, Ms. Schutzius was a Marketing Manager.

6. Ms. Schutzius was diagnosed with Multiple Sclerosis ("MS") in 2011, rheumatoid arthritis in 2015, and myoclonic seizure disorder, head and optical migraines, vertigo, depression, anxiety in 2018.

7. The Company employs 15 or more employees.

8. The Company is not exempt from the Americans with Disabilities Act of 1990, or as amended ("ADA" or "ADAAA").

9. During her employment, Ms. Schutzius had a qualified disability(ies) as defined by the ADA.

10. The Company is an employer as defined in the ADA.

11. Ms. Schutzius was an employee as defined in the ADA.

12. Ms. Schutzius filed a Charge of Discrimination against the Company with the EEOC on or about June 1, 2020.  *See* Charge No. 470-2020-02108, attached as Exhibit 1.

13.     On November 10, 2020, the EEOC issued Ms. Schutzius a Notice of Right to Sue, attached as Exhibit 2.

14.     Ms. Schutzius's Complaint has been filed within 90 days from receipt of authorization to bring a civil action.

15.     Ms. Schutzius has exhausted her administrative remedies.

16.     Jurisdiction and venue are appropriate in this Court.

### First Accommodation Request and Response

17.     Despite suffering from MS for several years, Ms. Schutzius did not experience life-interfering symptoms from it while working for the Company.

18.     However, in mid-2018, Ms. Schutzius began experiencing debilitating symptoms that was unclear if it was related to her MS.

19.     The severe symptoms included dizzy spells, erratic heart rate, impaired vision, head and optical migraines, extreme exhaustion, concentration and memory problems, numbness/tingling in both arms and legs, depression, and anxiety.

20.     In August 2018, Ms. Schutzius informed the Company that she was experiencing the dizziness as it was interfering with her ability to drive.

21.     In the first week of November 2018, Ms. Schutzius met with HR and Senior Leadership and was permitted to work from home because she could not drive, and had several doctor's appointments scheduled for the month of November.

22.     During this meeting, Ms. Schutzius inquired about FMLA or short-term disability, and was told FMLA was not an option but offered to send her information on short-term disability.

23.     Within a week of this meeting, Ms. Schutzius was changed from a salaried employee to an hourly employee.

24.     Although her pay rate was not changed, Ms. Schutzius's net pay decreased as she was only paid for hours working from home, which was nearly impossible as Ms. Schutzius could not leave her home without assistance.

25. Ms. Schutzius missed several hours of work from November 2018 through January 2019 when she was not well enough to work, in the hospital from these symptoms, and/or to attend doctor's appointments.

26. In January of 2019 when Ms. Schutzius was returning to work in the office, HR called Ms. Schutzius a "walking liability" after she submitted doctor's notes.

27. For the first half of 2019, Ms. Schutzius was allowed to work from home or make up her time on the weekends, as she continually communicated with her direct report manager, the Company's VP/Partner and the Company's CEO, about the status of her health, doctor's appointments, diagnostic testing, blood work and infusions, that she was required to have completed every 3 to 6 months.

28. Ms. Schutzius was switched back from hourly to salary in March 2019.

### HR's Good Intention Turns Sour

29. In early July of 2019, the Company's new HR manager approached Ms. Schutzius about getting a formal approved accommodation so it would be protected[1].

30. The HR manager mentioned that Ms. Schutzius would have no problem getting one approved since she was qualified.

31. Even though Ms. Schutzius had the option to work from home or make up time with permission, she did not exercise that unless experiencing a vertigo flare up.

32. Part of the reason was that the Company's VP/Partner told her that other employees were taking advantage of working from home for non-medical reasons, and it created problems among the group.

33. Another reason was because the flare ups from her disability were so unpredictable that it was nearly impossible for Ms. Schutzius to get advanced permission to work from home, causing her to be unpaid for that day.

34. Even though Ms. Schutzius filed a complaint with HR regarding the inability to obtain advanced approval for the dizzy spells and migraines and the unfairness of the policy for someone with a disability, she followed the new guidelines as requested.

---

[1] Ms. Schutzius never completed a formal accommodation request or had it documented.

35. On August 14, 2019, Ms. Schutzius submitted the formal accommodation paperwork completed by her doctor, requesting a flexible schedule and/or working remote.

36. In November of 2019, the Company initiated a policy that nobody could work from home without prior approval, effective January 1, 2020.

37. Concerned about this, Ms. Schutzius asked HR if that included her as she had not heard back about her accommodation request.

38. HR stated that she would need permission, just as any other employee would, but mentioned that while others had permission to work remotely, there were only a couple of employees who ever had approval to work from home before.

39. Ms. Schutzius was also told that she could no longer work from home, and any flex time hours would have to be approved in advance.

40. Ms. Schutzius did not get a response to her August accommodation request until December 2, 2019.

41. The response stated that even though her doctor did not list any work restrictions, the Company was granting her continued use of flex time and/or working remotely with advanced approval only, effective as of December 9, 2019.

42. The Company's response also stated that it was switching Ms. Schutzius back to hourly again from salary.

**Second Accommodation Request and Response**

43. On January 9, 2020, Ms. Schutzius went back to the doctor to amend the accommodation paperwork and list her work restrictions.

44. The doctor specified that she could not drive for 12 to 24 hours after she has an episode of vertigo.

45. Since Ms. Schutzius commuted from Illinois to Indiana for work and was required to drive to various site locations at times, this was a work restriction.

46. Sensing the increased annoyance from the VP/Partner and CEO when she requested flex time, and after the November email implementing the no work from home policy, Ms. Schutzius tried to avoid requesting it.

47. However, there were times that required her to work 7 days a week in order to maintain her full-time workload.

48. By March 2020, Ms. Schutzius still did not have a response from her second formal accommodation request and COVID-19 was becoming a real threat.

49. One of Ms. Schutzius's co-workers told her she should not be in the office at all because her immune-compromised system was going to catch COVID-19 and get everyone sick.

50. Ms. Schutzius reported these comments to HR and to her knowledge, nothing was investigated.

51. On March 16, 2020, the Company informed all the employees that anyone with health issues or immune-compromised should work from home.

52. Ms. Schutzius submitted two doctor's notes requesting that she be allowed to work home, and it was granted by HR.

53. The permission was short-lived as Ms. Schutzius was notified on March 20 that she was being terminated.

54. She never received a response to her second formal accommodation request.

55. Ms. Schutzius later found out that only one other employee was permanently terminated, and this employee was also immune-compromised and requested to work from home.

56. A few other employees were furloughed and have all since been called back to work.

57. One employee had her pay reduced, which was appropriate since that employee was very new to the Company and was much less qualified than Ms. Schutzius, yet she made significantly more than Ms. Schutzius.

### Allegations Concerning Damages

58. Ms. Schutzius requested an accommodation, on various occasions.

59. Defendant did not engage in the interactive process.

60. Instead, the Defendant waited several months to notify Ms. Schutzius of its decision and switched her from salary to hourly a few times.

61. The Defendant later removed her accommodation, leaving her in limbo and fearful of retaliation by requesting another accommodation.

62. The stress exacerbated Ms. Schutzius's condition(s).

63. Ms. Schutzius began working longer hours in an attempt to successfully complete the tasks that the Defendant expected.

64. Ms. Schutzius continued to suffer from the disabling conditions.

65. The Defendant significantly reduced Ms. Schutzius's overall compensation by switching her back and forth from salary to hourly.

66. On March 20, 2020, Defendant terminated Ms. Schutzius's employment.

67. As a result of Defendant's actions, Ms. Schutzius's medical condition worsened.

68. Ms. Schutzius's termination has also deprived her of a health insurance policy that she was relying on for continued medical treatment, forcing her to purchase an expensive marketplace plan that would cover all her specialists, diagnostics, bloodwork, and daily medications.

69. Ms. Schutzius's termination eliminated her future income and resulted in a loss of wages.

70. Because of the loss in income, Ms. Schutzius was unable to sell her home that was near to closing, and lost the proceeds from that sale, as well funds put down for a new residence, all information that Defendant was aware of.

71. Ms. Schutzius's termination, and the resulting stress, has made finding replacement employment difficult.

72. Ms. Schutzius has suffered emotional distress, lost wages, and compensatory damages as a result of Defendant's actions – both before and because of her termination.

## LEGAL CLAIMS

### Count One: ADA Discrimination

73. Plaintiff reincorporates allegations in paragraphs 1-72, as well as the Introduction, as if fully set forth here.

74. At all relevant times, Ms. Schutzius had an impairment that substantially limited one or more life activities.

75. Ms. Schutzius's MS, the treatment for it, and the long-term effects of both substantially affected her life activities, including walking, seeing, standing, and driving.

76. Ms. Schutzius's condition was not singular, nor temporary, and has no beginning and ending points.

77. Ms. Schutzius continues to be treated by physicians for these conditions; and that treatment has no targeted end date as her condition is incurable.

78. At all relevant times, Ms. Schutzius was qualified to perform the essential functions of her job with or without a reasonable accommodation.

79. Ms. Schutzius did, in fact, have a qualifying disability pursuant to the ADA.

80. The Company knew of Ms. Schutzius's conditions.

81. The Company's HR manager regarded her as disabled and treated her as such.

82. Ms. Schutzius made requests for accommodations.

83. Defendant unilaterally partially granted those requests, but never had a discussion with Ms. Schutzius about the partial denial or if other options were available.

84. The Company failed to engage in the interactive process.

85. The Company terminated Ms. Schutzius because of her disability and her need for an accommodation.

86. Ms. Schutzius is entitled to back pay, front pay, compensatory damages, punitive damages, and her reasonable attorneys' fees and costs.

**Count Two:  ADA Retaliation**

87. Ms. Schutzius reincorporates allegations in paragraphs 1-86, as well as the Introduction, as if fully set forth here.

88. Ms. Schutzius had a qualifying disability.

89. The Company regarded her as being disabled and treated her as such.

90. Ms. Schutzius engaged in protected activity when she requested accommodations for that disability.

91. Defendant terminated Ms. Schutzius for engaging in protected activity.

92. Ms. Schutzius is entitled to back pay, front pay, compensatory damages, and her reasonable attorneys' fees and costs.

### Conclusion

**THEREFORE**, Ms. Schutzius respectfully requests the following relief:

A. A judgment in her favor against the Defendant;

B. An award of back pay, front pay, and compensatory damages;

C. Injunctive relief against the Company to prohibit future violations of the ADA;

D. Pre- and post-judgment interest on award;

E. Reasonable attorneys' fees and costs; and

F. All other appropriate equitable relief.

**DATED** this 4th day of December, 2020.

**The Foster Group, PLLC**

*Megan Weides*
Troy P. Foster
Megan Weides
902 W. McDowell Road
Phoenix, Arizona 85007
*Counsel for Plaintiff*